## Hendrie v. Perkins.

(Decided October 6, 1931.)

W. O. SMITH and EAVES & SANDIDGE for appellant.

HUBERT MEREDITH and T. O. JONES for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

W. S. Hendrie & Company, a corporation, was engaged in the jewelry business in Central City. W. S. Hendrie, who was also a stockholder, was the secretary-treasurer and general manager of the corporation. On or about December 19, 1927, Helen Perkins, a young unmarried woman, was employed by the corporation as a saleswoman and continued in its employment until about the 8th day of February, 1928. In the month of March, 1928, W. S. Hendrie, acting for and on behalf of the corporation, made the necessary oath before the presiding judge of the county court of Muhlenberg county and obtained a warrant charging Miss Perkins with grand larceny. At her examining trial she was dismissed for want of sufficient proof. At the April, 1928, term of the Muhlenberg circuit court Hendrie went before the grand jury and procured the return of two indictments, one charging Miss Perkins with grand larceny, and the other with embezzlement. At her trial on the charge of embezzlement the court instructed the jury to find her "Not guilty." Thereupon, upon motion of the commonwealth, the indictment for grand larceny was dismissed for want of proof and stricken from the docket. Thereafter Miss Perkins brought this action against the corporation and

W. S. Hendrie individually to recover damages for malicious prosecution. A trial before a jury resulted in a verdict and judgment in her favor against both Hendrie and the corporation for $5,800. Hendrie alone appeals.

The defenses interposed were: (1) Probable cause; (2) absence of malice; (3) advice of counsel. Appellant insists that each of these defenses was made out, and that the court erred in not directing a verdict in his favor. A resume of the evidence will be necessary.

Briefly stated, the evidence on behalf of the defendant is as follows: Miss Perkins began working for the company on December 19, 1927, and remained there until about February 8, 1928. The only other assistants or employees were appellant's wife and his relatives. In the storeroom was a cash register, and in a room in the rear was the safe. This safe was unlocked, and was accessible to all those in the store. According to appellant he discovered a shortage of $166, and later on other shortages, making a total of $355.16. After the discovery he questioned appellee, who said, "I don't know a darn thing about it," and walked to the front of the house. She then gathered together her belongings and left. Appellant then consulted an attorney, and told him that there had been some systematic stealing going on in the store, and that the shortage amounted to $355.16, and asked the attorney how to proceed. Again on February 10, appellant went to his attorney and again related the facts in connection with the alleged shortage. The attorney then advised him to find out how much money appellee had spent while in his employ, and after some investigation he reported that, while earning a salary of $12 a week she had paid out the sum of $109. After obtaining this information he and his attorney came to the store and requested the appellee to come there. At this conference appellee was informed that another shortage had been discovered. Appellant's attorney informed appellee that she was under suspicion, and might be arrested, and asked her if she had any money at the time she came to work for Hendrie & Company. She replied that she did not, and as a further evidence that she did not have any money she had three or four cold checks around town. When asked if she had paid all the checks on the sheet appellant had there, she admitted paying practically all of them. She further admitted that she had paid Ed Hughes $10 with which to buy a pint of prescription whisky. Later on appel-

lant asked permission to talk to appellee's father and mother and went to appellee's home and laid before her father and mother all the facts in connection with the shortage, telling them that appellee was under suspicion. During the conversation between the attorney and appellee's father, the father asked for time to make arrangements to replace the shortage. Appellee's mother expressed astonishment, and complained that she had been compelled to stop her daughter from drawing on her account, saying that she had drawn a number of cold checks. There was further evidence that appellee, when questioned about the shortage, stated that she would rather work her finger nails off and pay it back. Appellant also consulted his attorney on other occasions.

According to appellee, appellant called her from the front of the store on the afternoon of February 8, 1928. Appellant, his wife, and brother-in-law, Herbert Son, were there. When appellee joined them, appellant told her there was a shortage of $128 in the cash. She told them she did not know anything about it, and appellant kept insinuating that she got the money. Appellee then went back to her customers at the front of the store, worked an hour or two longer, had appellant give her a statement of her account, and left. On February 13, appellant phoned appellee to come to the store at once as he wanted to see her on a personal matter. On her arrival at the store, appellant, his attorney, and his brother-in-law, were in the back room. The attorney told appellee that he was representing the company, and that there was a shortage of $355.16. Appellee said to Mr. Hendrie, "Why, you told me the amount of the shortage was $128.00." Hendrie replied that he checked up and found "this other mistake." Appellant or his attorney then told appellee that they had a long list of accounts, cold checks, and other expenditures made by her while she worked at the store, amounting to $109, which was more than the amount she had received as salary for that period, and that if she did not pay the company the amount of the shortage she would probably be arrested the next day. When asked where she got the money to pay the accounts, appellee said, "From Mama." They also threatened to arrest appellee if she did not pay the company $355.16 by the next morning. They then told her that they wanted to see her father and mother, and for her to bring them to the store at once.

She told them that her father was ill, and that he and her mother could not come that afternoon, but if they wanted to see her parents she would bring them to the store at 10 o'clock the next morning. Appellant said that this did not suit him, and informed appellee that he and his attorney were going to her home to see her father and mother at once, and went to the telephone to call a taxi. She said it was not necessary to call a taxi; that if they were determined to go to the home of her parents she would take them in her car. On reaching the Perkins home, Mrs. Perkins asked why the parties had come. Appellee replied, ''They are trying to pull a dirty deal.'' When they were all assembled in the living room of the Perkins home, appellant's attorney told Mr. and Mrs. Perkins that there was a shortage of $355.16 in the cash taken in at the jewelry store during the time their daughter worked there. He further demanded payment of this amount from Mr. Perkins, and threatened to have appellee arrested if he did not pay at once. During the conversation appellee was accused of spending $109 during the time of her employment, or a sum much larger than the salary she received, and of giving cold checks. Mrs. Perkins was asked if she had given her daughter any money, and she replied that she had given her both cash and checks since Christmas. Mr. Perkins told appellant and his attorney that he would make investigation and decide what he would do in a few days. At that time Mr. and Mrs. Perkins owned some property, and had a small regular income sufficient for the necessary support of the family. They had a charge account at various places, and these accounts were carried in the name of Mrs. Perkins. The family bank account, which was kept with the Citizens' Bank of Drakesboro, where they formerly lived, was also carried in the name of Mrs. Perkins. The children of Mrs. Perkins, including appellee, drew checks on this bank account. On account of the number of persons drawing on the account the account was occasionally overdrawn. To avoid this confusion, the bank suggested to Mrs. Perkins that she have only one person sign all the checks, and they agreed that no check should be cashed in the future unless signed by her husband. This agreement was made the latter part of December, 1927, and after appellee had begun to work for the Hendrie Jewelry Company. Appellee was not advised of the arrangement until after she had drawn

four checks: One to Rubenstein Bros., for $1.69; one to M. & R. Shoppe for $3; one to Wells Bros. for $1.50; and one to W. S. Hendrie Jewelry Company for $5. The Rubenstein check was returned because the signature was not authorized. Upon being notified that this check was not honored, appellee called her mother and was advised of the arrangement at the bank. Her mother gave her the money to take care of all the checks she had drawn, and appellant, who had the largest check, knew all these facts and was present when appellee telephoned her mother, and heard all that appellee said about it. Thereafter, instead of appellee's signing her mother's name to checks, she was given checks signed in blank by J. T. Perkins, and she filled in the name and amounts in paying her mother's accounts, or for money for her personal use. On numerous occasions her mother also gave her cash. During the month of January and the early part of February appellee paid several small accounts for her mother with checks drawn on her mother's account, and signed by her father, and with cash furnished by her mother. She also made some small purchases with cash which her mother had given her. It further developed that of the entire $109 which appellant accused appellee of spending, all of it, with the exception of about $20, was paid in cash furnished by Mrs. Perkins, or by checks signed by J. T. Perkins. There was further evidence by appellant's brother-in-law that the safe was kept locked in the daytime, and it is admitted that the only persons who knew the combination of the safe were appellant, his wife, and Tom McGowan.

It is a rule in this state that whether certain facts constitute probable cause is a question of law for the court, but whether such facts are proven is a question for the jury. Cumberland State Bank v. Ison, 218 Ky. 412, 291 S. W. 405; Schwartz v. Boswell, 156 Ky. 103, 160 S. W. 748; Hayes v. Ketron, 223 Ky. 119, 3 S. W. (2d) 172. Here the facts are in dispute. On the one hand, it is claimed that the shortages occurred only when appellee was at work; that she had access to the safe; and that she issued cold checks and spent more money than she received as salary. On the other hand, appellant made different statements as to the amount of the shortage. He first charged appellee with taking the money from the drawer or cash register. Afterwards he claimed that the money was taken from the safe. There was evidence that the safe was kept locked, and that appellee did not

know the combination. It further appeared that the checks given by appellee were not cold, and that, with the exception of about $20, payments made by her during the time of her employment were made by checks drawn on the account of her mother, or in cash furnished by her mother. In view of the conflict in the evidence, there can be no doubt that the question of want of probable cause was properly submitted to the jury.

With respect to the claim that no malice was shown, it must not be overlooked that the existence of malice is a question of fact for the jury, and malice may be inferred only from proof, or want of probable cause. Emler v. Fox, 172 Ky. 290, 189 S. W. 469; J. B. Colt Co. v. Grubbs, 206 Ky. 809, 268 S. W. 817; W. T. Grant Co. v. Taylor, 223 Ky. 812, 4 S. W. (2d) 741. The jury having found that appellant acted without probable cause, it had the right to infer and find that he acted maliciously. Not only so, but the inference of malice was greatly strengthened by appellant's repeated insistence on a settlement, and his persistance in pursuing appellee and carrying on the prosecution after she had been acquitted in the county court.

Under our law advice of counsel is not a defense to an action for malicious prosecution unless all the facts bearing on the guilt of the accused, known or ascertainable by reasonable inquiry, were fully and fairly disclosed. Gatz v. Harris, 134 Ky. 550, 121 S. W. 462; Smith v. Fields, 139 Ky. 60, 129 S. W. 325, 30 L. R. A. (N. S.) 870; Nance v. Cash, 143 Ky. 358, 136 S. W. 619, Ann. Cas. 1912D, 422; Weddington v. White, 148 Ky. 671, 147 S. W. 17; Cincinnati, N. O. & T. P. R. Co. v. Bedow, 189 Ky. 140, 224 S. W. 674. The facts disclosed to counsel were that appellee had given certain cold checks, and that during the time of her employment she had spent $109 when her salary was only $12 a week. If these were all the facts, a different case would be presented. However, if appellant had taken the trouble to inquire further he would have ascertained that the checks were not cold, and that, with the exception of about $20, all the money paid out by appellee during the time in question either consisted of cash furnished by her mother, or was represented by checks drawn on her mother's account. In other words, he would have ascertained that her means of discharging her or her mother's obligations were not confined to money taken from the safe. In view of this situation, it cannot be said as a matter of law that appel-

lant fully and fairly disclosed to counsel all the facts bearing upon the guilt or innocence of appellee which he knew or could have ascertained by reasonable inquiry, and it follows that appellant was not entitled to a peremptory instruction.

Judgment affirmed.